IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

INA JACOBI,                          )
                                     )
        Plaintiff,                   )
                                     )        NO. 3:20-cv-00797
v.                                   )        JUDGE RICHARDSON
                                     )
ROBERTSON  COUNTY,  TENNESSEE,       )
DEPUTY JARRETT PENTECOST             )
*in his official and individual capacity*   )
                                     )
        Defendants.                  )

## MEMORANDUM OPINION AND ORDER

        This case concerns the Robertson County Detention Center's use of the Inmate

Communication System ("ICS") and Deputy Jarrett Pentecost's two arrests of Plaintiff for

allegedly sending threatening messages through the ICS to Bridget Freeman, an individual

incarcerated at the Robertson County Jail at the time of Plaintiff's arrests.

        Pending before the Court is the motion for summary judgment (Doc. No. 17, "Motion")

filed by Defendants Robertson County ("the County") and Deputy Jarrett Pentecost ("Deputy

Pentecost") (collectively, "Defendants"). Plaintiff responded, (Doc. No. 26), and Defendants

replied (Doc. No. 34). In addition, the Court has identified potential grounds for summary

judgment not raised not by Defendants.  Though the Court has the authority to raise issues *sua*

*sponte* at the summary judgment stage, the opposing party "must 'be afforded notice and

reasonable opportunity to respond to all the issues to be considered by the court.'" *Shelby Cty.*

*Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Tr. Fund*, 203 F.3d 926, 931

(6th Cir. 2000) (quoting *Employers Ins. of Wausau v. Petroleum Specialties, Inc*., 69 F.3d 98, 105

(6th Cir. 1995)). Therefore, the Court wishes to provide Plaintiff the opportunity to submit

supplemental briefing and any additional evidence relevant to the issues raised *sua sponte* by the Court. If Plaintiff wishes to file additional evidence or briefing as to her claims, she can do so by January 31, 2023. If no additional evidence or briefing is filed, the Court will consider the materials provided in response to Defendants' motion to summary judgment to make its ruling.

**FACTS**[1]

1. <u>THE INMATE COMMUNICATION SYSTEM</u>

The Inmate Communication System ("ICS") is at the center of this case. The ICS permits incarcerated persons at the Robertson County jail ("Jail") to communicate with individuals outside of the jail. (Doc. No. 28 at 1). Vendengine Inc., a private subcontractor, created the ICS and continues to maintain and service the program. (*Id.* at 2–3). The ICS was put in place to limit the amount of physical mail passing through the Jail, which in turn preserves the Jail's resources and helps limit potential contraband from entering the Jail. (*Id.* at 5). Because the ICS is primarily a "feature" (as the parties put it) of the Jail and not a tool of law enforcement writ large, law enforcement officers such as Deputy Pentecost do not come into contact with the ICS on a daily basis. (*Id.*). And it appears, albeit without being directly addressed by either side in their briefing, that law enforcement officers receive no formal training from the County or other governmental entity on the ICS.

Plaintiff alleges that the ICS is susceptible to manipulation, such that the sender of an electronic message can make it appear that an electronic message was sent from someone other

---

[1] Unless indicated otherwise (as for example when particular facts are identified as being merely asserted by a party or otherwise qualified in some manner), the facts set forth in this section are undisputed. Thus, the facts set forth herein are either undisputed or specifically identified as disputed. In stating the facts herein, the Court often uses the language used by the party that asserted the facts in the first instance; this helps the Court ensure that the facts as stated herein are undisputed, even if the language used is less precise or thorough than the Court would have used were it writing on a blank slate.

than the actual sender. Indeed, Plaintiff contends that the information fields for a particular message, such as the phone number and name, in the ICS can be easily filled in by the sender (prior to sending) to misrepresent who is actually sending the message, *i.e.*, to make it appear that a different individual is sending the message. (Doc. No. 27 at 3). Plaintiff refers to this tactic as "spoofing." (*Id.*). It is through these manipulative tactics, Plaintiff alleges, that she was framed for sending threatening electronic messages to Bridget Freeman in the Jail, when in fact someone else sent those messages. The County contends that, prior to this lawsuit, it had never been aware of potential problems with spoofing associated with the ICS. (Doc. No. 17 at 7–8).

2.   PLAINTIFF'S ARRESTS

In August 2019, Deputy Pentecost was dispatched to the residence of Kyle Freeman to investigate a report that Plaintiff had sent threatening electronic messages to Mr. Freeman's wife, Bridget Freeman, via the Inmate Communication System ("ICS"). (Doc. No. 28 at 6). Deputy Pentecost conducted an in-person interview of Mr. Freeman during which Mr. Freeman told Deputy Pentecost that Bridget had received correspondence from Plaintiff saying that Plaintiff was "out for blood" and that she was going to harm Mr. Freeman. (*Id.* at 7). Mr. Freeman also provided a written statement to Deputy Pentecost, in which he stated that Plaintiff had sent a message to his wife, Bridget, "stating she was gonna kill me tonight . . . ." (*Id.* at 7). Deputy Pentecost also interviewed Bridget Freeman while she was incarcerated at the Jail and obtained a written statement from her, in which she stated that Plaintiff was threatening to kill her and her husband. (*Id.* at 8).

Deputy Pentecost then obtained and examined a written report from a supervisor at the Jail (where Bridget Freeman was in fact incarcerated at the time) that included the electronic correspondence at issue in the investigation. (*Id.* at 9). The County refers to the report as the "First

ICS Printout." (*Id.*). Mentioned in one of the messages was the name of Plaintiff's late daughter, "Mary [C]arol." (*Id.* at 11). The messages were also displayed alongside a telephone number, 615-838-9088 and the name "Grace," Plaintiff's middle name. (*Id.* at 11, 25).

After reviewing the First ICS Printout, Deputy Pentecost went to Plaintiff's residence to investigate further. Once he arrived, he spoke with Terry Williams, Plaintiff's significant other, who confirmed that the "615" phone number belonged to Plaintiff. (*Id.* at 13). When Plaintiff arrived moments later, she also confirmed that the phone number belonged to her and that she was the only one with access to her phone. (*Id.* at 14).[2] At some point in the discussion, Plaintiff told Deputy Pentecost that she and Mr. Freeman were in a disagreement regarding a camera, which Deputy Pentecost took to be a possible motive for the threatening messages. (*Id.* at 16).

Deputy Pentecost then placed Plaintiff under arrest for assault, and she was booked at the Jail on August 22, 2019 at 1:00 A.M. (*Id.* at 17). Plaintiff was released on bond that same morning subject to several conditions, including refraining from contacting Bridget Freeman and making future threats against her. (*Id.* at 18). That same day, Deputy Pentecost was told by the supervisor at the Jail that Bridget Freeman had received additional threatening electronic messages via the ICS. (*Id.* at 18). Plaintiff was then arrested that evening for allegedly violating her bond conditions and an Order of Protection that Bridget Freeman had obtained against her. (*Id.* at 32).

---

[2] The Court notes that there is disagreement between the parties regarding the extent to which Deputy Pentecost examined Plaintiff's phone while at her residence. (Doc. No. 28 at 14–15). Defendants contend that Deputy Pentecost received consent from Plaintiff to examine her phone while at her residence prior to the first arrest, but Plaintiff alleges that "Deputy Pentecost refused to look at Plaintiff's phone . . . ." (*Id.* at 15). Plaintiff asserts that Deputy Pentecost did not look at Plaintiff's phone until her second arrest and that his review of the device did not reveal any direct evidence of the threatening messages sent to Bridget Freeman. (*Id.* at 15). The Court notes that to the extent that Deputy Pentecost attempted to examine Plaintiff's phone prior to either of her arrests, that only bolsters the Court's conclusion that Deputy Pentecost conducted a reasonable investigation. Nonetheless, as discussed below, because the Court need not reach the question of whether Deputy Pentecost had probable cause to arrest Plaintiff, it is not necessary for the Court to resolve this factual dispute.

## PROCEDURAL BACKGROUND

Plaintiff filed this action against Robertson County and Deputy Jarrett Pentecost, alleging under 42 U.S.C. § 1983 that her arrests and detention violated several of her constitutional rights and that the County and Deputy Jarrett Pentecost committed several state torts against her. Plaintiff requests compensatory and punitive damages and injunctive relief.

On January 28, 2022, Defendants moved for summary judgment on all claims against them. (Doc. No. 17). Plaintiff filed a response (Doc. No. 26, "Response") and Defendants filed a reply (Doc. No. 34). As indicated above, the Court herein discusses issues not raised by the parties. Plaintiff therefore may respond by submitting additional evidence or briefing by January 31, 2023. If no additional evidence or briefing is submitted, the Court will resolve the Motion based on the current record.

## LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446

F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc*., 901 F.3d 619, 627–28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628.[3] Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex,* 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed (*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively) can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii)

---

[3] Courts (appropriately) at times refer interchangeably to a party being able to raise a genuine issue as to fact and a reasonable jury being able to find in the party's favor on that fact, and this Court does likewise.

that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792, at *5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

**DISCUSSION**

1. <u>MALICIOUS PROSECUTION</u>

Plaintiff alleges that her two arrests by Deputy Pentecost, and subsequent initiation of her criminal prosecution, support a malicious-prosecution claim under § 1983. (Doc. No. 1 at 9, 10). Constitutional malicious-prosecution claims—as distinguished from malicious-prosecution tort claims under state law—are premised on the Fourth Amendment as incorporated into the Fourteenth Amendment. *See Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). "To succeed on a malicious-prosecution claim under § 1983 [against a particular defendant] when the claim is premised on a violation of the Fourth Amendment, a plaintiff must prove the following: First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute." *See id.* at 308–309 (internal quotation marks omitted). "Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution." *See id.* at 308. The plaintiff also must show that "as a consequence of the legal proceeding," she suffered a "deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure." *See id.* at 308–309 (internal quotation marks omitted). And finally, "the criminal proceeding must have been resolved in the plaintiff's favor." *See id.* at 309.

Because Plaintiff's claim of malicious prosecution is against Deputy Pentecost in his individual capacity, the doctrine of qualified immunity is implicated. "Qualified immunity shields government officials from civil liability in the performance of their duties so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity will ordinarily apply unless it is obvious that a reasonably competent official would have concluded that the actions taken were unlawful." *See Swoap*, 833 F.3d at 652. When an officer-defendant is entitled to qualified immunity as to a particular claim, that claim must be dismissed.

In her response to Defendants' motion for summary judgment, Plaintiff expends several pages arguing why her claim for malicious prosecution ought to survive based on the alleged lack of probable cause to arrest Plaintiff on both occasions. Curiously, however, Plaintiff then concedes that Deputy Pentecost is entitled to qualified immunity, and that the Court should "grant summary judgment to Deputy Pentecost based on his having qualified immunity." (Doc. No. 27 at 22). Plaintiff thus has abandoned the claim against Deputy Pentecost, and therefore summary judgment in his favor is warranted. *See, e.g.*, *Conner v. Hardee's Food Sys., Inc.,* 65 F. App'x. 19 (6th Cir. 2003) (finding that the plaintiffs had abandoned their claim "[b]ecause [they] failed to brief the issue before the district court"); *Parker v. Zale Corp.,* 864 F. Supp. 2d 670, 684–85 (E.D. Tenn. 2012) (noting that defendants are entitled to summary judgment as to claims that plaintiff abandons at the summary judgment stage).

Given Plaintiff's attention to her malicious-prosecution claim in her Response, it remains plausible that she perhaps believes that a malicious-prosecution claim can survive against *the County.* Municipalities cannot be held liable under Section 1983 on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Instead, a municipality can be liable under Section 1983 only on the basis of so-called *Monell* liability, which requires the plaintiff to establish that: "(1) the plaintiff's harm was caused by a constitutional violation; and (2) the [municipality] was responsible for that violation." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009). Given the requirements of *Monell* liability, "municipalities are liable for harms resulting

from a constitutional violation only when the injury resulted from an 'implementation of [the municipality's] official policies or established customs.'" *Spears*, 589 F.3d at 256 (quoting *Monell*, 436 U.S. at 708 (Powell, J., concurring)) (emphasis in original). *Monell* liability requires a showing that the alleged misconduct is the result of a policy, statement, regulation, decision or custom promulgated by the municipality or its agent. *Monell*, 436 U.S. at 690–91. A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following circumstances: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fisher*, 735 F.3d 462, 478 (6th Cir. 2013). The Court addresses below the possibility of *Monell* liability for the County based on the alleged malicious prosecution. But with respect to Plaintiff's claim of malicious prosecution against *Deputy Pentecost*, suffice it to say that (as noted above) Plaintiff has abandoned the claim.

The Court pauses to make an additional point about the claim against Deputy Pentecost and its relationship to the claim against the County. From the face of the Complaint, it appears that Plaintiff purports to sue Deputy Pentecost in his official capacity (as well as his individual capacity). Suing an individual in his or her official capacity "generally represents another way of pleading an action against an entity of which an officer is an agent." *See Monell*, 436 U.S. at 690 n. 55. Therefore, to the extent that Plaintiff seeks to hold Deputy Pentecost liable in his official capacity for the claims contained in the Complaint, these "claims are duplicative of the municipal liability claim lodged against the County," *Carthew*, 709 F. Supp. 2d at 19, that the Court addresses below. When such duplication is identified in the context of a motion for summary judgment, courts have granted summary judgment on the duplicative official-capacity claim

brought against the individual defendant(s). *See e.g.*, *Just. v. Atchison*, No. CIV.A. 5:08-148-JMH, 2009 WL 3413914, at *2 (E.D. Ky. Oct. 20, 2009) (ruling that "summary judgment on all of the claims against all [individual] Defendants in their official capacities will be granted as duplicative of the claims against [the county defendant]"); *Brown v. Wichita Cnty.*, No. 7:05–CV–0108–O–KA, 2009 WL 2393821, at *3 n. 1 (July 23, 2009) (granting summary judgment for Wichita County Sheriff in his official capacity as duplicative of suit against Wichita County). This Court will do likewise.

2. <u>FAILURE TO TRAIN</u>

a. **Malicious Prosecution**

Plaintiff alleges that the County is liable under § 1983 because it failed to train Deputy Pentecost on the ICS and this failure led to her alleged malicious prosecution. Specifically, Plaintiff argues that the County should have trained its "officers on the ICS such they [had] a basic understanding of the ICS operation and of the vulnerability of the ICS to spoofers…." (Doc. No. 27 at 17). The County argues that Plaintiff cannot meet the deliberate-indifference standard required to support her failure-to-train claim. Plaintiff, by contrast, argues that the County's failure to provide any training to officers such as Deputy Pentecost on the ICS amounts to deliberate indifference due to the vulnerability of the ICS to spoofing. Although not an issue raised by Defendants, the Court finds it likely that Plaintiff's concession of Deputy Pentecost's qualified immunity as to her malicious prosecution claim precludes her from succeeding on her failure-to-train claim.

For a municipality to be liable under § 1983 based on harm resulting from the failure to implement a municipal policy, the lack of a policy must amount to deliberate indifference to the injured party. *See Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 900 (6th Cir. 2004); *see also*

*Escamilla v. Webb Cnty., Tex.*, No. 5:11-CV-13, 2015 WL 3771085, at *6 (S.D. Tex. June 17, 2015) ("For a [municipality] to be liable for failing to act affirmatively, such as a failure to train or supervise, or a failure to implement a policy, a plaintiff must show that the [municipality] was deliberately indifferent to the fact that its failure to act would likely cause violations of particular constitutional rights." (citation omitted)). As indicated above, a failure to train can be a circumstance that supports *Monell* liability, but only if there exists what amounts to a municipal *policy* (as opposed to a mere instance) of inadequate training. *See Burgess*, 735 F.3d at 478. Moreover, the alleged failure to train must reflect a deliberate indifference to the rights of those who come within the sphere of municipal employees. *See Cerbelli v. City of New York*, 600 F. Supp. 2d 405, 412 (E.D.N.Y. 2009) ("To the extent plaintiff's *Monell* claim is based on [a municipality's] alleged failure to train. . . , plaintiff must show that the alleged failure 'amounts to deliberate indifference to the rights of persons with whom the [municipal employees] come into contact.'" (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989))). In summary, to establish a municipality's liability based on a failure-to-train theory, a plaintiff must show that the municipality 1) acted with deliberated indifference "to the fact that its inadequate training or supervision would lead its agents to violate constitutional rights," and 2) the improper training "actually caused" the plaintiff's injury. *See Gambrel v. Knox County, Kentucky*, 25 F.4th 391, 408–409 (6th Cir. 2022). The Court is unpersuaded that Plaintiff can succeed on either requirement.

       i.    *Deliberate indifference*

The Sixth Circuit has found that "[t]o show deliberate indifference, a plaintiff must prove that the violation of a clearly established right was a 'known or obvious consequence' of the lack of training or supervision." *See Gambrel*, 25 F.4th at 408 (quoting *Connick v. Thompson*, 563 U.S.

51, 61 (2011)); *Watson v. Sexton*, 755 F. Supp. 583 (S.D.N.Y. 1991) ("To be 'deliberately indifferent' to rights requires that those rights be clearly established.").

The requirement, for a failure-to-train claim, that the right at issue be "clearly established" is reminiscent of the requirements for qualified immunity. But the existence of such a requirement for a failure-to-train claim does *not* suggest that municipal defendant can have qualified immunity the way an individual defendant can; indeed, the U.S. Supreme Court rejected such a suggestion over four decades ago. *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 638 (1980). Rather than going to whether a municipality has qualified immunity (which, as just noted, as a matter of law it cannot), the requirement that a constitutional right be clearly established for a municipality to be liable (based on deliberately indifference to such right) serves to prevent the excessive liability that would be engendered by holding "local government automatically liable for the injuries that their agents cause." *See Gambrel*, 25 F.4th at 408.

The deliberate indifference requirement adds an additional layer to a failure-to-train claim. The plaintiff must establish not only a failure on the part of a municipality to train its agents, but also a resulting violation of a clearly established constitutional right at the hands of a municipal agent. "When a plaintiff attempts to establish municipal liability based on a 'failure to train employees,' he must show the municipality's 'deliberate indifference to constitutional rights.' *Nichols v. Wayne Cnty., Michigan*, 822 F. App'x 445, 452 (6th Cir. 2020) (quoting *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 994 (6th Cir. 2017)). "But a municipal policymaker cannot exhibit fault rising to the level of *deliberate* indifference to a constitutional right when that right has not yet been clearly established." *Id.* (internal quotation marks omitted). It follows that where a plaintiff is unable to prove *either* the underlying violation of a constitutional right *or* that

such right was clearly established, they cannot proceed on the related failure-to-train claim. *Nichols* illustrates this concept. 822 F. App'x 445.

In *Nichols*, the Sixth Circuit affirmed the dismissal of a failure-to-train claim because the plaintiff (Nichols) failed to prove a violation of a constitutional right that was clearly established. Officers seized Nichols's car on suspicion that it was involved in a violation of Michigan's Identity Theft Protection Act. *See Nichols*, 822 F. App'x at 446. The prosecutor never initiated forfeiture proceedings, and Nichols eventually had his car returned. *See id.* Nichols then filed suit against the county alleging that the Due Process Clause entitled him to an intervening hearing between the seizure of his car and the forfeiture proceedings. *See id.* Specifically, Nichols argued that the county prosecutor "failed to train and supervise attorneys" on the need for "prompt post-seizure, pre-forfeiture hearings in front of a neutral decision maker." *See id.* at 451–452 (internal quotation marks omitted). The Sixth Circuit disagreed. Because Nichols failed to direct the court to any precedent sufficient to prove that such a constitutional right to an intervening hearing within a certain time was clearly established, his failure-to-train claim could not proceed. *See id.* at 452.

Therefore, in *Nichols*, the plaintiff had to prove that he both suffered a violation of a clearly established constitutional right and that the county (*i.e.*, the county prosecutor, who was the "municipal policymaker" of the kind to which the Sixth Circuit was referring) failed to train the attorneys so as to avoid violation of that right. Because the plaintiff could not meet the first requirement, his failure-to-train claim could not proceed.

Plaintiff faces a similar problem in this case as to her failure-to-train claim premised on a violation of her right against malicious prosecution. Plaintiff conceded that Deputy Pentecost is entitled to qualified immunity, and therefore she has implicitly waived (or perhaps forfeited) any argument that she had a clearly established right against her alleged malicious prosecution.

Although Plaintiff's concession on this point was made with respect to Deputy Pentecost's qualified immunity, the Court is hard-pressed to find that the right *was* clearly established for purposes of a claim against the County when (by Plaintiff's own concession) the right was *not* clearly established for purposes of a claim against Deputy Pentecost. Therefore, the Court finds it unlikely that Plaintiff is able to raise a genuine issue of material fact as to her failure-to-train claim against the County—*i.e.*, that it is unlikely that she will be able to show evidence sufficient to raise a genuine dispute as to the material (indeed essential) issue of whether Deputy Pentecost violated a clearly established right of Plaintiff against malicious prosecution as required to show the deliberate indifference that is indispensable to Plaintiff's failure-to-train claim against the County.[4]

    *ii.*    *Causation*

Even if Plaintiff were successful in proving deliberate indifference, which the Court finds that she likely will not be, the Court finds that causation is likely lacking. Plaintiffs pursuing a failure-to-train claim must prove "two types of causation from the common law of torts: but-for (or factual) causation and proximate causation." *See Gambrel*, 25 F.4th at 408–209. Actual causation requires "proof that proper training would have prevented" the particular constitutional violation, whereas proximate cause requires "that a municipality could reasonably foresee that an employee's wrongful act would follow from the lack of training." *See id.* at 409. Although this point is not often discussed in this circuit, other courts have noted that "[t]o establish a causal nexus 'the identified deficiency in [the] training program must be closely related to the ultimate

---

[4] Arguably, where the underlying alleged constitutional violation supporting the failure-to-train claim is one attributable directly to the county (such as an allegedly unconstitutional municipal ordinance), the plaintiff should not be required to prove a violation of a clearly established right. *Arrington-Bey v. City of Bedford Heights, Ohio*, 858 F.3d 988, 994 (6th Cir. 2017).

[constitutional] injury." *Parker v. School District of Philadelphia*, 346 F. Supp. 3d 738, 746 (E.D. Pa. 2018) (internal quotation marks omitted).

It remains unclear how adequate training on the ICS would have changed Deputy Pentecost's decision to arrest Plaintiff (on both occasions), thereby beginning the process of her prosecution. As noted, Plaintiff argues that the County should have trained its officers to have a "basic understanding of the ICS operation" and of the "vulnerability of the ICS to spoofers…." (Doc. No. 27 at 17). Although Plaintiff fails to provide any additional description of the nature or extent of training that she contends should have been given (and would have prevented injury to Plaintiff), it seems that Plaintiff is alluding to training geared to warning law enforcement officers that the ICS—like almost any technology that permits electronic communication—is susceptible to hacking or spoofing. In other words, any training on the ICS would include a warning to officers not to take the information from the messages sent via the ICS at face-value as to who sent the message (and any other information relevant to the investigation, such as the phone number), but instead, to take reasonable investigatory steps to corroborate that information.

Deputy Pentecost, however, did not rely solely on the information from the face of the electronic messages. He conducted a thorough investigation, interviewing and taking the written statements of several witnesses, examining Plaintiff's phone, identifying a motive, using contextual clues from the messages to connect them with Plaintiff, and matching the identifying information from the messages with that belonging to Plaintiff, as well as gathering additional facts. Plaintiff appears to be under the illusion that a training would have necessarily resulted in Deputy Pentecost believing that the identifying information from the ICS messages was false. (Doc. No. 27 at 12). This, however, is a logical leap. At most the training would have ensured that officers corroborate the information available from the ICS. Because Deputy Pentecost carried out

the reasonable steps to attempt to confirm the identity of the sender of the ICS messages, Plaintiff is unlikely to be able to show but-for causation. Even if Deputy Pentecost had not undertaken the investigatory steps that he did, the Court refuses to assume that the training suggested by Plaintiff would have necessarily corrected a misimpression of Deputy Pentecost that the messages were not spoofed. In other words, the Court does not accept the premise that that those working in law enforcement operate on the assumption that all electronically sent messages bear truthful and accurate information regarding the identity of the sender, unless and until they are explicitly warned that the assumption is unsafe and that the purported identity of the sender may be inaccurate. Such a premise flies in the face of common sense, not to mention the real-world experience of the undersigned.[5] Therefore, the Court remains unpersuaded that Plaintiff would be able to prove that adequate training on the ICS would have prevented the alleged malicious prosecution of Plaintiff, which in turn prevents Plaintiff from succeeding on her failure-to-train claim.[6]

---

[5] The undersigned spent approximately a decade doing criminal investigations, first as a sworn federal agent and then as a federal prosecutor. A particular focus of his work (especially as a federal agent) was investigating threatening communications (including electronically sent messages) violative of federal law. Over and over during this time, he encountered situations where the actual identity of the sender of a threatening message was vital to an investigation. It would be a huge understatement to say that in these situations, the purported identity of the sender of a message (as reflected in the body and/or the header of an electronic message) was not assumed the be the actual identity of the sender. It was entirely obvious to the undersigned that no such assumption should be made, and the undersigned would be giving himself far too much credit were he to maintain that this would *not* likewise be obvious to the vast majority of law-enforcement personnel tasked with investigating threatening communications.

   The undersigned notes that his experience in law enforcement does not bias him in favor of either Defendant in any way whatsoever.

[6] Plaintiff may argue that the existence of causation is belied by the fact that Deputy Pentecost agreed in his deposition that without the phone number in the data field in the ICS and his belief that the information was accurate, "he would not have had probable cause to have arrested the [Plaintiff]." (Doc. No. 27 at 7). Such an argument, however, would not hold water. Indeed, had it provided training on the susceptibilities of the ICS to spoofing or hacking, the County may have thereby made clear (in what the undersigned is confident would already have been understood by the vast majority of law-enforcement personnel) that the sender information in the ICS message here at issue *could have been* spoofed (or otherwise inaccurate). But

### b. Remaining Failure-To-Train Claims

In additional to her failure-train-claim based on her alleged malicious prosecution, Plaintiff alleges that the County's failure to train Deputy Pentecost on the ICS also resulted in "excessive force, unlawful seizure, illegal arrest, false imprisonment, and incarceration of the [Plaintiff] and cruel and unusual punishment." (Doc. No. 1 at 11). With respect to the failure-to-train claims based on excessive-force and cruel-and-unusual punishment, Plaintiff has implicitly forfeited (or waived, or abandoned) these claims by failing to defend against Defendants' arguments made in their motion for summary judgment. Therefore, summary judgment on Plaintiff's the failure-to-train claims for excessive force and cruel and unusual punishment is warranted. *See Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").[7]

Furthermore, as is the case here, when "a false-imprisonment claim arises out of an alleged false arrest," the claims are treated as "identical." *See Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020).[8] Therefore, though Plaintiff's false imprisonment and false arrest violations are brought

---

that is not to say that had Deputy Pentecost been provided such training, he necessarily would have concluded (considering all the circumstances surrounding that message as illuminated by his investigation) that the message *actually was* spoofed.

[7] The Court notes that it is particularly odd that Plaintiff asserts failure-to-train claims based on alleged violations of her rights against excessive force and cruel and unusual punishment. Beyond the fact that Plaintiff likely cannot establish that the County was deliberately indifferent, Plaintiff has alleged no facts explaining how the County's failure to provide training on the ICS would have caused any alleged excessive force in the carrying out of her arrest(s) or infliction of cruel and unusual punishment while incarcerated. That is, any training on the ICS provided to law enforcement would have no bearing on *how* arrests connected to information gathered from the ICS are carried out, let alone how those arrestees are then treated once incarcerated.

[8] Because Plaintiff provides no additional facts as to her alleged false imprisonment, the Court assumes that the alleged false imprisonment consisted of her detention after her arrests.

as-failure-to-train claims as is necessary to hold the County liable, the Court considers these violations identical and will refer to them as a single failure-to-train claim based on Plaintiff's two allegedly illegal arrests.

Therefore, the remaining claims to be addressed are Plaintiff's failure-to-train claims based on illegal arrests and unlawful seizure violations, all of which require Plaintiff to prove lack of probable cause. *See Holloran v. Duncan*, 92 F. Supp. 3d 774, 792 (W.D. Tenn. 2015); *Waad v. Willis*, 2018 WL 6505371, at *13 (E.D. Mich. Dec. 11 2018). Further, because Plaintiff seeks to hold the County liable for these alleged constitutional violations, she must also show that her rights against the unlawful seizure and illegal arrests were clearly established.

It strikes the Court, however, that Plaintiff's concession with respect to her malicious prosecution claim against Deputy Pentecost may negatively affect her ability to succeed on her failure-to-train claims based on unlawful seizure and illegal arrests violations. As discussed, Plaintiff abandoned her malicious prosecution claim against Deputy Pentecost when she conceded that Deputy Pentecost is entitled to qualified immunity on the grounds that it was not clearly established that his actions regarding her arrests and eventual prosecution amounted to malicious prosecution. Plaintiff asserts that probable cause to arrest her was lacking,[9] and she treats probable cause as the only element of a malicious prosecution claim that is subject to reasonable dispute. This means that if she concedes that the violation of her right not to be subject to malicious prosecution was not clearly established, (which she does), that must be because she concedes that

---

[9] In her discussion of Deputy Pentecost's qualified immunity, she writes, "Plaintiff genuinely believes that Defendant Pentecost was at the time of the arrest and remains under the mistaken belief and assumption that the ICS data was reliable and trustworthy . . . ." (Doc. No. 27 at 21). Her position is clearly that Deputy Pentecost lacked probable cause based on the lack of reliability of the facial indication on the ICS messages as to who sent them.

the absence of probable cause was not clearly established, *i.e.*, would not have been *clear* to a reasonable officer in Deputy Pentecost's position. So Plaintiff's concession was really to the effect that it was not *clearly established* that Deputy Pentecost lacked probable cause at the time of the arrests.

Having effectively conceded that it is was not clearly established that probable cause was lacking, and consequently, that it was not clearly established that Deputy Pentecost maliciously prosecuted Plaintiff, Plaintiff seems unlikely to be able to succeed on her failure-to-train claim against the County for the alleged unlawful seizure and illegal arrests she suffered. As noted, Plaintiff will have to prove probable cause for both claims. Further, because she brings these claims under a theory of failure to train, she will also have to prove that Deputy Pentecost's actions violated her clearly established rights against unlawful seizure and illegal arrest—something she effectively conceded that she could not prove in connection with her claim against Deputy Pentecost for malicious prosecution (by effectively conceding that it was not clearly established that Deputy Pentecost lacked probable cause to arrest her).[10] Therefore, the Court finds it unlikely that Plaintiff will be able to prevail on her failure-to-train claims based on unlawful seizure and illegal arrests violations against the County.

---

[10] The Complaint refers to the state law tort of invasion of privacy. (Doc. No. 1 at 8, 11). Plaintiff does not attempt to defend or pursue this claim in her response to Defendants' motion to for summary judgment. Her failure to mount a defense to Defendants' arguments in their summary judgment motion as to the state law claims is equivalent to a waiver or forfeiture of those claims. *See Nichols v. Michigan City Plant Planning Dept.*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). Even assuming that Tennessee courts uniformly recognize a stand-alone tort of invasion of privacy, the Complaint fails plead any facts supporting such a claim. *See Roberts v. Essex Microtel Associates, II, L.P.*, 46 S.W. 3d 205 (Tenn. Ct. App. 2000) (discussing whether Tennessee recognizes the tort of invasion of privacy and determining it does). While Tennessee Courts have not opined on the elements of the tort, the Second Restatement of Torts—which is also cited by the court in *Roberts*—states that "the right of privacy is invaded by" "unreasonable intrusion upon the seclusion of another…" Restatement (Second) of Torts § 652A(2)(a). Plaintiff has supplied no facts rising to the level of an invasion of privacy. Instead, Plaintiff's facts illustrate nothing more than a routine investigation undertaken by a law enforcement official in ordinary course.

<u>CONCLUSION</u>

For the reasons stated herein, Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims of excessive force and cruel and unusual punishment against the County and malicious prosecution against Deputy Pentecost. As to all other claims, because the Court *sua sponte* has raised issues that potentially could result in summary judgment against Plaintiff, Plaintiff must be given an opportunity to present evidence and argument on these issues in an attempt to avoid summary judgment. Accordingly, Plaintiff shall have until January 31, 2023 to file supplemental evidence or briefing to respond on the issue of deliberate indifference and causation raised by the Court herein with respect to the remainder of her claims. The Court intends to rule on the Motion as promptly as feasible after January 31, 2023.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE